1
2
3
4
5
6
7
8
9
10
11
12
13

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STEPHEN SHELTON,

                                    Plaintiff,

        v.

NANCY A. BERRYHILL, Deputy
Commissioner of Social Security for
Operations,

                                    Defendant.

CASE NO. C17-1324-MJP-MAT

REPORT AND RECOMMENDATION
RE: SOCIAL SECURITY DISABILITY
APPEAL

14      Plaintiff Stephen Shelton proceeds through counsel in his appeal of a final decision of the

15 Commissioner of the Social Security Administration (Commissioner).   The Commissioner denied

16 plaintiff's applications for Disability Insurance Benefits (DIB) and Supplemental Security Income

17 (SSI) after a hearing before an Administrative Law Judge (ALJ). Having considered the ALJ's

18 decision, the administrative record (AR), and all memoranda of record, the Court recommends this

19 matter be REMANDED for further administrative proceedings.

20                          **FACTS AND PROCEDURAL HISTORY**

21      Plaintiff was born on XXXX, 1979.[1]  Plaintiff has a bachelor's degree in neurobiology and

22

23
────────────────────
[1] Dates of birth must be redacted to the year.  Fed. R. Civ. P. 5.2(a)(2) and LCR 5.2(a)(1).

REPORT AND RECOMMENDATION
PAGE - 1

physiology.  (AR 66.)  He previously worked as a car electronics installer.  (AR 54.)

Plaintiff filed DIB and SSI applications in August 2013, alleging disability beginning March 1, 2008. (*See* AR 16.)  His applications were denied initially and on reconsideration.  On September 17, 2015, ALJ Laura Valente held a hearing, taking testimony from plaintiff and a vocational expert (VE).  (AR 46-100.)  At hearing, plaintiff amended his onset date to August 3, 2010.  (AR 51.)

On December 22, 2015, the ALJ issued a decision finding plaintiff not disabled from March 1, 2008 through the date of the decision.  (AR 16-37.)  Although the ALJ pointed to the March 2008 date in her conclusion, she earlier noted that the period under consideration began on April 26, 2012, the date prior, never appealed denials of disability applications became administratively final.  (AR 16.)

Plaintiff timely appealed.  The Appeals Council denied plaintiff's request for review on July 7, 2017 (AR 1-6), making the ALJ's decision the final decision of the Commissioner.  Plaintiff appealed this final decision of the Commissioner to this Court.

## JURISDICTION

The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

The Commissioner follows a five-step sequential evaluation process for determining whether a claimant is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2000).  At step one, it must be determined whether the claimant is gainfully employed.  The ALJ found plaintiff had not engaged in substantial gainful activity since the alleged onset date.

At step two, it must be determined whether a claimant has a severe impairment.  The ALJ found plaintiff's anxiety disorder, major depressive disorder, and substance abuse disorder severe.

REPORT AND RECOMMENDATION
PAGE - 2

She considered other conditions and found them either not severe or not medically determinable. Step three asks whether a claimant's impairments meet or equal a listed impairment. The ALJ found plaintiff's impairments did not meet or equal a listed impairment.

If a claimant's impairments do not meet or equal a listing, the Commissioner must assess residual functional capacity (RFC) and determine at step four whether the claimant has demonstrated an inability to perform past relevant work. The ALJ found plaintiff able to perform work at all exertional levels, but with the following non-exertional limitations: can maintain concentration and pace in two-hour increments for complex and detailed tasks; can work superficially and occasionally with the general public; can work in the same room with co-workers, but should not work in coordination with them; can respond appropriately to occasional supervisor criticism, meaning he should only interact with a supervisor on an occasional basis; and can adapt to simple workplace changes. With that assessment, the ALJ found plaintiff able to perform his past relevant work as an auto accessories installer.

If a claimant demonstrates an inability to perform past relevant work, or has no past relevant work, the burden shifts to the Commissioner to demonstrate at step five that the claimant retains the capacity to make an adjustment to work that exists in significant levels in the national economy. With the assistance of the VE, the ALJ also found plaintiff capable of performing other jobs, such as work as a production assembler and hand packager.

This Court's review of the ALJ's decision is limited to whether the decision is in accordance with the law and the findings supported by substantial evidence in the record as a whole. *See Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). *Accord Marsh v. Colvin*, 792 F.3d 1170, 1172 (9th Cir. 2015) ("We will set aside a denial of benefits only if the denial is unsupported by substantial evidence in the administrative record or is based on legal error.") Substantial

REPORT AND RECOMMENDATION
PAGE - 3

evidence means more than a scintilla, but less than a preponderance; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). If there is more than one rational interpretation, one of which supports the ALJ's decision, the Court must uphold that decision. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

Plaintiff argues the ALJ erred in failing to adequately address opinions and other evidence showing he would have difficulties with absences, tardiness, and fatigue, in finding no severe sleep impairment at step two, and in attributing his problems to "avoidance," rather than a mental impairment. He contends the ALJ's errors implicated the RFC assessment. Plaintiff requests remand for an award of benefits with an onset of August 3, 2010. The Commissioner argues the ALJ's decision has the support of substantial evidence and should be affirmed.

<u>Absences, Tardiness, and Fatigue</u>

The VE testified that one absence a month, tardiness two-thirds of the week, and/or the need for a forty-five minute nap would preclude work. (*See* AR 94, 98-99.) Plaintiff observes that, while the ALJ acknowledged his severe anxiety and major depressive disorders, she attributed his complaints of fatigue to his anxiety disorder, rather than any sleep disorder. (AR 22.) Plaintiff maintains the record is replete with evidence he had difficulty leaving the house or performing activities due to anxiety and fatigue, and that the ALJ substantially failed to address whether he would have absences from work in assessing the RFC, and failed to give sufficient reasons for rejecting evidence supporting the conclusion he would have such absences. Plaintiff identifies the specific assignments of error discussed below.

A.   <u>Janessa Daugherty, LMHC</u>

Janessa Daugherty served as plaintiff's mental health counselor. As an "other source," the

REPORT AND RECOMMENDATION
PAGE - 4

ALJ could assign the opinions of Daugherty less weight than the opinions of an "acceptable medical source," such as a physician, but was required to provide germane reasons for their rejection.  20 C.F.R. §§ 404.1502, 404.1513, 416.902, 416.913; *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir. 1996); and *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

Daugherty began treating plaintiff in August 2010, diagnosed anxiety disorder, and assigned a Global Assessment of Functioning (GAF) score of 48, describing "serious symptoms" or "any serious impairment in social, occupational, or school functioning."  Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) (DSM-IV-TR).[2]  As of July 15, 2011, Daugherty added a diagnosis of major depressive disorder.  (AR 982.)

In letters dated February 6 and May 17, 2012, Daugherty described plaintiff's significant ongoing anxiety, including pervasive bad thoughts, difficulty leaving his apartment, being easily overwhelmed by excursions outside the home and interactions with people, strong somatic reactions, severe anxiety, and quickly flaring to anger. (AR 573, 1061.)  Plaintiff's anxiety and depression hindered his capacity for self-care and he displayed a low frustration tolerance and rigidity in thinking and action. While presenting as highly intelligent and intellectual, plaintiff's emotional difficulties made it difficult to even contemplate applying for a job or to begin or complete tasks, and his fear of greater destabilization prevented him from moving forward.

After a break in October 2012, plaintiff resumed therapy with Daugherty in June 2013. In a letter dated September 11, 2013, Daugherty stated plaintiff remained severely hindered, with

---

[2] The most recent version of the DSM does not include a GAF rating for assessment of mental disorders. DSM-V at 16-17 (5th ed. 2013).  While the Social Security Administration (SSA) continues to consider GAF scores from acceptable medical sources as opinion evidence, a GAF score cannot alone be used to "raise" or "lower" someone's level of function, and, unless the reasons behind the rating and the applicable time period are clearly explained, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.  Administrative Message 13066 ("AM-13066").

REPORT AND RECOMMENDATION
PAGE - 5

incapacitating anxiety leading to agoraphobic avoidance and periods of significant decompensation. (AR 925.) Even with the support of the Division of Vocational Rehabilitation (DVR) and his own major efforts to manage his illness, plaintiff struggled daily activating even for simple tasks and his symptomology did not allow "him to gain any traction." (*Id*.) In a July 9, 2014 letter, Daugherty described plaintiff's inability to control his excessive worrying, excessive sleep disturbances, frequent fatigue, anger and irritability, and paralyzing anxiety. (AR 1135.) Plaintiff's incapacitating anxiety could lead to agoraphobic avoidance "wherein he struggles to leave his house for basic necessities like food or medical appointments." (*Id*.) He had experienced significant periods of decompensation, with disordered thought processes and unstable moods, making it difficult to keep track of time and take care of himself. Plaintiff's depression resulted in low frustration tolerance, rigid thinking, and a struggle to take care of basic physical needs, lose weight, or show interest in the outside world. He had strong feelings of judgment towards self and others, illogical ideas of responsibility, and past suicidal ideation. Plaintiff continued to have difficulty being timely, initiating and completing tasks, did not adapt well to unexpected changes or unknown situations, and had shown only slow, partial improvement. (AR 1135-36.)

In February 2015, Daugherty completed a Medical Source Statement, opining plaintiff had moderate limitations in relation to short, simple instructions, making judgments on simple work-related decisions, and interacting with supervisors, and was markedly limited in all other respects. (AR 970-71.) Daugherty based these limitations on plaintiff's incapacitating anxiety, agoraphobic avoidance, periods of significant decompensation, distracting ruminations, low frustration tolerance, rigid thinking, feelings of judgment, hindered relational capacity, and anger and irritability. She also assessed a limitation in arriving punctually to scheduled appointments due to plaintiff's anxiety, dissociative process, and shame surrounding his limitations, and stated he

1    consistently struggled to leave his house or keep track of time.  (AR 971.)

2        The ALJ did not find Daugherty's opinions persuasive and deemed them inconsistent with

3    Daugherty's own clinical notes.  (AR 32.)  While limited, the notes did show plaintiff had a clear

4    capacity to activate, with clear routine and expectations, while visiting with his parents for an

5    extended time.  (AR 977.)  The notes did not describe any periods of significant decompensation

6    or dissociative process, and the record did not contain a referral for inpatient psychiatric services,

7    which would be expected in such circumstances.  Daugherty did not mention in her letter that their

8    sessions had become "more erratic", which was consistent with some decline, but not the extent

9    implied in her letters.  (AR 981.)

10       The ALJ also found Daugherty's opinion as to plaintiff's hindered ability to relate to others

11   contrary to the opinion of his DVR counselor and numerous social interactions.  (AR 32.) The

12   DVR counselor described plaintiff as "a clear, eloquent, and intelligent communicator who seemed

13   to enjoy socializing with others despite his reported anxiety when dealing with new people in new

14   situations."  (AR 23-24.)  Plaintiff's variety of social interactions included meeting with a friend

15   monthly; acquaintances at a bar he frequented; his ability to use public transportation and go to the

16   gym regularly; playing pinball at a local bar; looking around a retail store while looking for a job;

17   engaging with WorkSource for resume help; taking several extensive trips to visit his family in

18   Indiana; weekly social outings with a friend; volunteering at a car mechanic's and doing cash work

19   at a marijuana dispensary, resulting in "increased 'social' marijuana use."; continuing to work as

20   a handyman through the time of the hearing; sharing his home with his aunt for a time and his

21   mother when she came to visit; going out on a date; getting along with most of his DVR supervisors

22   and co-workers; and daily gym workouts, following by breakfast and socializing.  (*Id.* (citations

23   to record omitted).)

The ALJ additionally found Daugherty's opinions contrary to those of plaintiff's most recent medication manager, Dr. Catherine Shim.  (AR 32 (mistakenly referred to as Dr. Romm in the decision).)  Dr. Shim, in March 2015, agreed to complete paperwork for plaintiff's pursuit of disability benefits, but opined he was "unlikely to succeed given his clinical picture."  (AR 938.)

Plaintiff denies a single observation of improvement while in a supported environment shows he is more capable than found in Daugherty's years of treatment.  However, as the ALJ observed (*see* AR 32), the record contained few notes from Daugherty because plaintiff asked her to refrain from taking notes.  The ALJ was permitted to consider inconsistency with the notes that did exist.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (rejecting physician's opinion due to discrepancy or contradiction between opinion and the physician's own notes or observations is "a permissible determination within the ALJ's province.")  The ALJ also accurately observed that Daugherty's notes did not provide any support for periods of significant decompensation or dissociative process.  (AR 582-90, 976-88.)  *See generally Thomas*, 278 F.3d at 957 ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.")  The ALJ further reasonably found Daugherty's opinions inconsistent with the evidence from plaintiff's DVR counselor, the evidence of his social interactions, and with the March 2015 opinion of Dr. Shim.  *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (ALJ may consider the inconsistency of a medical opinion with the record); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ may consider inconsistency between physician's opinion and a claimant's level of activity); and *Morgan v. Commissioner of the SSA*, 169 F.3d 595, 603 (9th Cir. 1999) (ALJ appropriately considers internal inconsistencies within and between physicians' reports).

Plaintiff does not undermine the ALJ's several germane reasons for assigning minimal

REPORT AND RECOMMENDATION
PAGE - 8

weight to the opinions of Daugherty.  Plaintiff requests the Court nonetheless find the ALJ did not properly consider Daugherty's opinions concerning his ability to leave his house on a regular basis. In this respect, Daugherty's records do provide some support for her opinions.  (*See* AR 978 ("experiences period slowing down with some difficulty tracking days/time as his sleep becomes dysregulated"); AR 979 (changed medications and during transition experienced significant increase in anxiety and decreased ability to track time and positively activate); AR 984-85 (noting at intake:  "anxiety around leaving his house impacts his ability to contemplate going to interviews."))  However, because the ALJ provided sufficient reasons for rejecting the opinions of Daugherty, plaintiff does not demonstrate error in the ALJ's decision.

B.    <u>Dr. Scott Simpson</u>

Plaintiff received treatment from Dr. Scott Simpson from October 2011 through July 2013. In an initial form completed for the Department of Social & Health Services (DSHS) on March 26, 2012, Dr. Simpson noted diagnoses of depression, anxiety disorder, and marijuana dependence, and assigned a GAF of 54, reflecting "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning."  DSM-IV-TR 34.  At that time, plaintiff was decreasing his marijuana use and Dr. Simpson opined plaintiff's anxiety symptoms complicated finding employment, organizing paperwork, interviewing, talking with people, maintaining healthy weight, and reliably presenting to work.  (AR 679.)  Plaintiff was demonstrating great progress, needed support to continue receiving assistance, and, while currently unemployable, his continued improvement would "enable him to find and maintain employment in the future."  (AR 679-80.)

The ALJ found Dr. Simpson's opinions at odds with his own clinical notes, specifically, the normal mental status examination (MSE) conducted that same day.  (AR 34 (citing AR 682-83).)  The notes reflected plaintiff's steady improvement and motivation, and Dr. Simpson stated

REPORT AND RECOMMENDATION
PAGE - 9

that, assuming continued medical coverage, plaintiff "'should be able to land and thrive in an employed position.'" (*Id.* (quoting AR 684).) The ALJ posited that the "more restrictive view in the DSHS form may reflect Dr. Simpson's concern that the claimant maintain medical coverage, rather than an accurate assessment of the claimant's functionality." (*Id.*) She assigned the opinions minimal weight.

In a second DSHS form, completed June 5, 2013, Dr. Simpson noted plaintiff's significant substance use, including marijuana almost daily and prior and current, sporadic use of cocaine, and suspected plaintiff's social anxiety disorder preceded the substance dependence. (AR 662.) Dr. Simpson described plaintiff's "severe, chronic" social anxiety disorder and marijuana dependence, and observed that, during a 2012 period of sobriety, plaintiff had "less affective lability, less thought process disorganization, was more insightful, and more motivated for treatment." (AR 663.) Plaintiff has a fear of social situations, such as submitting resumes, social engagement, and meeting new people, or anticipation of situations, and avoided them "to the point that he was essentially homebound." (*Id.*) Plaintiff had been resistant to, but recently did quite well with medications. He demonstrated inability to decrease his use of marijuana despite desire, was "impaired in occupational and social function resultant of use," and "recognizes consequences but does not wish to stop." (*Id.*) Dr. Simpson assessed a GAF of 60, opined plaintiff was markedly limited in his ability to complete a normal work day and week without interruptions from psychologically based symptoms and in his ability to set realistic goals and plan independently, and marked all other categories of limitations as "indeterminate." (AR 664.) Dr. Simpson explained plaintiff was transferring out of his care and he had not assessed specifically for occupational impairments, while adding he felt comfortable reporting plaintiff had "significant impairment in pursuing work as a result of his psychiatric symptoms." (AR 665.) Plaintiff "pretty

1    clearly has social anxiety disorder," but "also underestimated the severity of his marijuana

2    dependence." (*Id*.) Dr. Simpson believed substance treatment was integral to any course of

3    treatment for plaintiff.

4        The ALJ found Dr. Simpson's observation that plaintiff was less anxious when sober

5    consistent with his March 2012 opinion of plaintiff's ability to obtain employment. (AR 34 (citing

6    AR 684).) Dr. Simpson did not relate the assessed limitations to the MSE included in the form,

7    "which indicated only that the claimant was digressive in his interaction but re-directable." (*Id*.

8    (citing AR 666).) The ALJ further stated Dr. Simpson made no mention of plaintiff's recent

9    cocaine use in the evaluation, and "failed to note that, despite escalation of use of substances, the

10   claimant continued to demonstrate improved anxiety or the claimant's increased activities,

11   including making money working at the marijuana dispensary, managing his brother's estate, and

12   his pursuit of a laboratory job." (*Id*.) The ALJ again assigned the opinions minimal weight.

13       In general, more weight should be given to the opinion of a treating physician than to a

14   non-treating physician, and more weight to the opinion of an examining physician than to a non-

15   examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Where not contradicted

16   by another physician, a treating or examining physician's opinion may be rejected only for "'clear

17   and convincing'" reasons. *Id*. (quoting *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991)).

18   Where contradicted, a treating or examining physician's opinion may not be rejected without

19   "'specific and legitimate reasons' supported by substantial evidence in the record for so doing."

20   *Id*. at 830-31 (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).

21       Plaintiff deems Dr. Simpson's opinions un-contradicted and argues the ALJ failed to

22   provide legally sufficient reasons for their rejection. Whether contradicted or not, the Court agrees

23   the ALJ's reasoning lacks the support of substantial evidence.

There is no clear inconsistency between Dr. Simpson's March 2012 opinions as to "moderate" symptoms that "complicat[ed]" plaintiff's functioning and the MSE reflecting "improved agitation, leans forward in [chair,]" an occasional fast rate of speech, "less irritable and frustrated," directable, "fair, improving" insight and judgment, and abstract thinking "improving, increasingly able to problem-solve[.]" (AR 680, 682-83.) The ALJ also overstated the differences in the views expressed in the treatment note and form, both of which reflected ongoing improvement and the belief plaintiff would be able to obtain employment if he continued to improve. (*See* AR 680, 684.)

With the September 2013 form, the ALJ reasonably considered that Dr. Simpson opined plaintiff's symptoms predated his use of substances, but that plaintiff underestimated the severity of his marijuana dependence and that his symptoms improved during a period of sobriety. (AR 665.) However, the ALJ did not fairly depict the MSE as reflecting only that plaintiff was digressive but redirectable. The MSE also indicated plaintiff was poorly groomed, with slightly loud, at times slightly fast speech, that he gesticulated dramatically, and presented with mild lability, becoming "tearful and upset during interview, stood up to leave during session, redirectable." (*Id.*) Plaintiff did not have thought process and content within normal limits, presenting as "linear/logical, digressive and ranges off topic, redirectable[,]" was mildly distractible, and had poor insight/judgment around substance use. (AR 666.) In the associated treatment note, plaintiff was also observed to be "somewhat labile, tearful at end of session and frustrated/upset", with slightly scattered thought form, and fair, improving insight and judgment. (AR 804.) Also, Dr. Simpson did mention plaintiff's recent cocaine use in the evaluation, his improved anxiety, and his activities as including performing odd jobs at a marijuana dispensary and his DVR participation. (AR 663 (anxiety symptoms "only recently successfully treated with

1   pheneizine."; "[H]as recently done quite well with pheneizine."; noting history of heavier cocaine

2   use with recent sporadic use; "Recently spent time at mechanic's shop with voc rehab[.]  Spends

3   a lot of time at marijuana dispensary doing odd jobs."))  The ALJ, for these reasons, erred in his

4   assessment of the opinions of Dr. Simpson.

5   C.    Dr. Catherine Shim

6          Plaintiff avers error in relation to treating physician Dr. Shim.  Specifically, plaintiff argues

7   the ALJ failed to acknowledge the persistent observations in Dr. Shim's treatment notes

8   concerning plaintiff's ongoing difficulty leaving the house.  (*See* AR 795, 812, 941, 946, 960, 965,

9   1073, 1077, 1084, 1088, 1094, 1099, 1106, 1110, 1112.)

10          The ALJ need not discuss each piece of evidence in the record.  *Vincent v. Heckler*, 739

11   F.2d 1393, 1394-95 (9th Cir. 1984).  The ALJ must, instead, "explain why 'significant probative

12   evidence has been rejected.'"  *Id.* (quoting *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981)).

13   Where a physician does not assign any specific limitations or opinions in relation to a claimant's

14   ability to work, the ALJ need not provide reasons for rejecting a physician's report because the

15   ALJ is not rejecting any of the report's conclusions.  *Turner v. Comm'r of Social Sec. Admin.*, 613

16   F.3d 1217, 1223 (9th Cir. 2010). *See also Morgan*, 169 F.3d at 601 (physician's reports did not

17   show how a claimant's "symptoms translate into specific functional deficits which preclude work

18   activity."; while physician "identified characteristics" that might at times limit the ability to work

19   on a sustained basis ("affective instability, intense anger, daily suicidal thoughts, and chronic

20   feelings of emptiness") he "did not explain how these characteristics precluded work activity").

21          The ALJ in this case discussed Dr. Shim's treatment notes at length (AR 27 (citing AR

22   795, 797, 814, 941, 947, 953, 956, 1073, 1194)), including her March 2015 statement that

23   plaintiff's pursuit of disability benefits was "'unlikely to succeed given his clinical picture.'"  (AR

32 (quoting AR 938).)   The ALJ also rejected plaintiff's allegations as to his symptoms and associated limitations, including that related to agoraphobia and isolative tendencies, as well as absences and tardiness.  (AR 26-30.)  Because the ALJ did not fail to consider and/or reject any significant probative evidence from Dr. Shim, this assignment of error fails.

D.    Dr. Robert Parker, Ph.D.

Dr. Robert Parker evaluated plaintiff for eligibility for DSHS benefits in September 2011. (AR 493-501.)  Dr. Parker assessed a GAF of 40, reflecting "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  DSM-IV-TR 34.  He assessed mild limitations in relation to simple instructions and being aware of normal hazards, moderate limitations in relation to complex instructions and learning new tasks, and marked limitations in relation to performing routine tasks without undue supervision, communicating and performing effectively in a work setting with public contact or limited public contact, and maintaining appropriate behavior in a work setting. (AR 495.)   He included the following observation with all but one assessed limitation: "depression, anxiety, somatic problems, poor frustration tolerance."  (Id.)  Dr. Parker assessed these limitations to last a maximum of six months, opined the prognosis for being able to engage in gainful employment on an ongoing and consistent basis was fair to good, and recommended consideration of a referral to a mental health clinic for an in-depth evaluation, an assessment of current usage of marijuana to distinguish between medical purposes versus abuse, and a referral to vocational services when more stable.  (AR 496.)

The ALJ assigned Dr. Parker's opinions minimal weight.  She described Dr. Parker's explanation for the limitations assessed as encompassing only a list of diagnoses and "poor frustration tolerance."  (AR 33.)  The ALJ noted that, although Dr. Parker did not relate any of the

REPORT AND RECOMMENDATION
PAGE - 14

MSE results, plaintiff performed well on the MSE, and, contrary to the assessed limitations, Dr. Parker opined plaintiff could participate in vocational rehabilitation. The ALJ took note of the fact Dr. Parker opined the limitations would last no more than six months. She added: "I also note that it does not appear that Dr. Parker was aware that the claimant carried a diagnosis of marijuana dependence, mentioning only a 'marijuana prescription,' indicating he did not have a complete diagnostic picture of the claimant." (*Id.*)

The ALJ reasonably discounted the restrictions assessed by Dr. Parker given their limited, six-month duration. *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008). However, the remainder of the ALJ's reasoning does not withstand scrutiny. First, Dr. Parker pointed to the symptoms he observed, not the diagnoses, as supporting his opinions. (*See* AR 494-95 (indicating he observed depression, anxiety, and somatic concerns, but not irritability/anger; describing the irritability/anger as affecting work activities through "[p]oor frustration tolerance, increased conflict, reduced task focus and effectiveness").) Second, the ALJ pointed to the MSE as the basis for the mild limitation in the ability to be aware of normal hazards, and the MSE contained notable observations, including lethargic motor activity, depressed, discouraged mood, with inappropriate laughter at times, restricted, blunted, mildly labile affect, normal thought content, but with severe somatic preoccupation, and a reporting of depressed mood, anxiety, decreased appetite, and auditory hallucinations. (AR 495, 499.) Third, Dr. Parker's opinion as to DVR participation was consistent with the assessment of limitations lasting only six months and the clarification a DVR referral should occur "when more stable." (AR 496.) Finally, Dr. Parker was aware of the existence of a diagnosis of substance abuse or dependence (AR 495) and, indeed, recommended an assessment of plaintiff's "current" use versus abuse. (AR 496). Given these errors, the Court finds the ALJ's assessment of the opinions of Dr. Parker to

lack the support of substantial evidence.

E.    DVR Records

Plaintiff points to DVR records as showing he would have difficulty with attendance. Plaintiff reported his debilitating anxiety kept him from interacting with others and leaving his apartment (AR 1072), he had problems with attendance and tardiness even in the part-time volunteer positions and had reported such problems as owing to his narcolepsy and anxiety (AR 1068), and his DVR case was closed in January 2014 due to ongoing adjustment of his medication and mental health instability (AR 1063-64).

The ALJ considered the DVR records in assessing plaintiff's testimony as to his symptoms and limitations.  For example, while he had a personality clash with the owner of a garage, the records showed plaintiff was able to accept supervision or direction well with two other supervisors and got along well with his DVR counselor, who opined his temptations to socialize with co-workers could be a distraction.  (AR 28.)  The ALJ found this consistent with plaintiff's work during the relevant period at a marijuana dispensary, where he used marijuana daily in a social setting and reported positive feedback for his work and less confrontation with the owners. The ALJ also found plaintiff's assertions as to absences and tardiness not as significant as alleged and determined they may not be attributable to his impairments.  She noted the DVR counselor's observation of a pattern of lateness and attendance issues, including being over an hour late on several occasions, and reasoned:  "The DVR counselor noted that the claimant has an 'excuse' for his tardiness, but the listed excuses did not include any reference to anxiety or narcolepsy particularly."  (AR 28-29 (also pointing to a March 2015 report of continuing to struggle with energy and appetite at times, but less than previously, and fewer instances of avoiding appointments or work secondary to anxiety).)  Also, while plaintiff testified the DVR file was

closed because he was unsuccessful in three placements, records indicated it was due at least in part to plaintiff's failure to contact their office.  (*Id.* (citing AR 1151, 1154).)

The ALJ addressed specific suggestions made by DVR counselor Rachel Mathison that plaintiff "start out on a part-time basis and 'work his way up to full-time hours once he became comfortable with his surroundings, the people, and after he had built up endurance.'"  (AR 32 (quoting AR 1069-70).)  The ALJ did not find these suggestions persuasive given that Mathison "attributed some of this to the claimant's 'lack of sleep,'" which the ALJ had found not established. (AR 32.)  Also, plaintiff's work quality and overall ability to interact with others was noted to be excellent.

The DVR records do show plaintiff had problems with attendance and tardiness and that, in his initial reporting to DVR, plaintiff attributed such issues to narcolepsy and anxiety.  (AR 1068.)  However, the ALJ reasonably discounted Mathison's suggestions regarding employment by considering that the excuses plaintiff gave for this behavior did not mention anxiety or narcolepsy, and that Mathison attributed these issues, at least in part, to plaintiff's sleep habits. (*See* AR 1068-70 ("Each time, he seemed to have excuses for the behavior, such as being confused about which bus to take, getting on the wrong bus, waking up late due to not hearing his alarm. Steve told me in the beginning that narcolepsy and anxiety both affected his ability to be on time and maintain consistent attendance.  . . .  If a job had a flexible schedule, this might work better for Steve given his irregular sleep habits."; "If it was possible to find a workplace where Steve could have flexible start and end times, this would probably work better for him due to the narcolepsy and irregular sleep patterns affecting his punctuality."))  The ALJ also reasonably considered that the DVR records showed plaintiff's excellent work quality and ability to interact with others.  Plaintiff does not, for these reasons, demonstrate error in the ALJ's consideration of

REPORT AND RECOMMENDATION
PAGE - 17

1    the DVR records.

2    F.    Benito Ybarra

3         Benito Ybarra submitted a letter describing the some five hours of work a month plaintiff

4    performed at a marijuana dispensary, doing things like changing light bulbs and cleaning.  (AR

5    455.)  Mr. Ybarra stated that, even though he performed quality work, plaintiff had issues:  "[He]

6    wasn't very punctual. He's easily distracted. And he works best when left alone to do the job."

7    (*Id.*)  They discussed these problems, plaintiff told him about his anxiety, and, to make things go

8    smoothly, Mr. Ybarra gave "him a lot of time between assigning jobs and needing it done." (*Id.*)

9    While more obvious initially, the problems had "become minimal." (*Id.*)

10        The ALJ was required to provide germane reasons for discounting the evidence from Mr.

11   Ybarra, a lay witness.  *Smolen v. Chater*, 80 F.3d 1273, 1288-89 (9th Cir. 1996).  The ALJ properly

12   provided such reasons by finding inconsistency with plaintiff's general work performance through

13   DVR, finding the work performed not inconsistent with the assessed RFC,[3] and taking note of

14   plaintiff's daily use of marijuana at the dispensary.  (AR 31.)

15   G.    Sleep Problems

16        Plaintiff avers step two error in the failure to find a severe sleep-related impairment.  At

17   step two, a claimant must make a threshold showing of medically determinable impairments

18   significantly limiting his ability to perform basic work activities.  *See Bowen v. Yuckert*, 482 U.S.

19   137, 145 (1987); 20 C.F.R. §§ 404.1520(c), 416.920(c).  "Basic work activities" refers to "the

20   abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1522(b), 416.922(b).  An

21

22   _____

23        [3] The ALJ specifically stated the work "may not be consistent with the tasks" in the RFC.  (AR 31.)
     As the Commissioner contends, the ALJ's statement is reasonably understood to reflect a conclusion that
     the work performed was not necessarily inconsistent with the work requirements in the RFC.

REPORT AND RECOMMENDATION
PAGE - 18

impairment may be found "'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual's ability to work.'" *Smolen*, 80 F.3d at 1290 (quoting Social Security Ruling (SSR) 85-28). "[T]he step two inquiry is a de minimis screening device to dispose of groundless claims." *Id.* (citing *Bowen*, 482 U.S. at 153-54). An ALJ must also consider the "combined effect" of an individual's impairments in considering severity. *Id.*

A claimant must show his medically determinable impairments are severe. Medically determinable impairments "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1521, 416.921. They must be established by objective medical evidence from an acceptable medical source, and may not be established through a statement of symptoms, a diagnosis, or a medical opinion. *Id.*

The ALJ considered plaintiff's allegation of narcolepsy significantly impacted his ability to work, and his testimony it caused daily excessive sleepiness, that he would fall asleep from ten minutes to three hours if he sat down to put on his shoes, and of sleeping five hours throughout the day, on top of seven-to-nine hours at night. (AR 21.) There was no clear diagnosis of narcolepsy, and the ALJ found plaintiff's testimony regarding his symptoms not consistent with the infrequent reports of sleep difficulties. She concluded plaintiff's narcolepsy was not medically determined. That is, while plaintiff alleged diagnosis at age eighteen and many providers listed the diagnosis in their notes, the record did not establish anatomical, physiological, or psychological abnormalities shown by medically acceptable clinical and laboratory diagnostic techniques. A multiple sleep latency test (MSLT) in November 1998 did not result in a definitive definition of narcolepsy and, while two sleep onset REM periods "were suggestive of narcolepsy or a narcolepsy variant, the clinician also noted 'sleepiness out of proportion to sleep disruption noted'

REPORT AND RECOMMENDATION
PAGE - 19

on testing administered the previous day." (*Id.* (citing AR 973-75).) When presenting for follow-up almost a year later, plaintiff reported the medication modafinil kept him awake during the day, he felt clouded, and had difficulty falling asleep at night. (*See* AR 973.) The physician prescribed Ritalin and instructed plaintiff to return and to call with problems.

The ALJ contrasted plaintiff's testimony at hearing with the fact he received very little treatment during the period at issue for this condition. (AR 21.) In September 2011, plaintiff reported his sleep was within normal limits. (AR 751.) The following month, he reported "no 'daytime sleep attacks,' and sleeping eight to nine hours." (AR 21 (citing AR 725).) The ALJ found indications of poor sleep hygiene that might explain plaintiff's complaints, such as his December 2011 report of sleeping eight to ten hours during the day and staying up all night reading online or watching television. (AR 22 (citing AR 716).) "Dr. Simpson discussed sleep therapy and behavioral modifications 'at length' to improve the claimant's sleep cycle[,]" and "there was no further discussion of sleep difficulties for almost two years. (*Id.* (citing AR 719).)

The ALJ found the record to indicate plaintiff's complaints of fatigue may be a symptom of his anxiety disorder. She pointed to plaintiff's October 2013 complaint of erratic sleep initially attributed to narcolepsy and anxiety, and then explained as based on fears he would not be able to provide for his parents or work full time. (*Id.* (citing AR 1106-08).) In September 2014, plaintiff reported a two-week "'out of wack'" sleep schedule, and Dr. Shim emphasized the importance of an appropriate sleep schedule to mood. (*Id.* (citing AR 921-22).) Records dated in 2015 included a report plaintiff "felt 'wonderful,' and was able to wake at 4 am and go to the gym, followed by going out to breakfast and socializing." (*Id.* (citing AR 1194).)

Plaintiff underwent another overnight diagnostic sleep study and MSLT in July 2015, resulting in a diagnosis of mild obstructive sleep apnea. (*Id.* (citing AR 1137).) The physician

REPORT AND RECOMMENDATION
PAGE - 20

stated:  "The diagnosis of narcolepsy could not be ruled out with this testing, but sleep disordered breathing has to be addressed first."  (AR 1137; *see also* AR 1148.)  Plaintiff began using a CPAP machine, but there was no indication of any treatment for narcolepsy and, given the recent use of the CPAP, it was not clear plaintiff's mild obstructive sleep apnea was expected to last twelve continuous months.  (AR 22.)  Although there was no mention of this in the record, plaintiff testified he treated the condition with sporadic forty-five minute naps because Ritalin irritated his stomach.  The ALJ concluded narcolepsy was not established as a medically determinable impairment and did not find the extent of plaintiff's complaints regarding fatigue consistent with the treatment history.

The ALJ provided substantial evidence support for his step two conclusion regarding narcolepsy.  It is not clear the ALJ considered all other diagnoses/conditions.  In particular, the record includes a June 2015 MSLT finding of "severe objective hypersomnia" (AR 1139-40), and a July 2015 "confirmed diagnosis of mild [obstructive sleep apnea (OSA)] with severe daytime somnolence." (AR 1137.)  Examining physician Dr. Iryna Sapieh noted the MSLT "showed significantly foreshortened mean sleep latency[,]" and observed plaintiff was "taking medication potentially influencing sleep and daytime performance."  (AR 1148.)

However, whatever the appropriate diagnosis, the ALJ did provide adequate reasons for discounting the alleged impact of any sleeping-related impairment on plaintiff's functioning, including the infrequent reports of sleep difficulties, the minimal treatment received, and the evidence of poor sleep hygiene.  The ALJ also considered evidence associated with plaintiff's allegations as to a sleep impairment at step four.  (AR 28-29, 32.)  *See Buck v. Berryhill*, 869 F.3d 1040, 1048-49 (9th Cir. 2017) (ALJ must consider at step four "limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"; finding no error

1   where ALJ considered impairments at both steps).  The Court, as such, finds no reversible step

2   two error established.

3   H.    Avoidance

4        The ALJ included the following discussion in her decision:

5            It appears that the claimant's most significant barrier to work is his
             avoidance.  One of his providers opined that the claimant appeared
6            interested in employment, "but is nervous about the prospect of
             failure" and relied on avoidance in multiple situations when failure
7            seems possible.  [(AR 635.)]  The claimant's medication manager
             opined that the claimant had a "fairly high functioning baseline," but
8            that he also experienced "maladaptive cognitive distortions when he
             fails to meet perfection consistent with his upbringing and resulting
9            in his avoidance through substance abuse, increased anxiety, and
             increased depression."  [(AR 810.)]  She later noted that the claimant
10           struggled with "all or nothing thinking."  [(AR 1078.  *See also* AR
             1090.)]  There may also be an element of dependency, as earlier
11           clinical notes indicate that the claimant sought to be "taken care of"
             in some ways.  [(AR 980.)]  Yet, the claimant's counselor opined
12           that the claimant was able to demonstrate "a clear capacity to actuate
             with the clear routine and expectations he received while visiting his
13           parents for an extended time."  [(AR 977.)]

14  (AR 30.)  Plaintiff argues the ALJ erred in attributing his problems to "avoidance" and in failing

15  to acknowledge this behavior as a symptom of his diagnosed mental impairments.  He relates this

16  issue to his difficulty leaving his house due to anxiety.

17       Viewed in isolation, the ALJ's reasoning is arguably problematic.  That is, it would not be

18  reasonable for the ALJ to consider plaintiff's avoidant behavior as separate and apart from his

19  mental impairments.  However, viewed in context and with consideration of the decision as a

20  whole, the Court finds no error.

21       The ALJ found the extent of plaintiff's alleged symptoms and associated limitations

22  inconsistent with the longitudinal history, and his specific allegations of agoraphobia, aggression,

23  and inability to get along with others "particularly irreconcilable with the treatment history."  (AR

REPORT AND RECOMMENDATION
PAGE - 22

26-28.)  The analysis included a lengthy discussion of relevant medical evidence.  (*See id.*)

The ALJ found plaintiff's engagement in a wide variety of social activities to contradict his allegation of "virtual agoraphobia" and that, while he reported more significant isolative tendencies while adjusting to medications, he was engaged with others and regularly leaving his home through the bulk of the relevant period.  (AR 28; *see also* AR 22-23.)  The ALJ found plaintiff's alleged inability to work due to absenteeism or tardiness did not appear as significant as alleged and may not be attributable to his impairment, pointing to the varied excuses he gave during his DVR engagements and his later improvement.  (AR 28-29.)  Earlier in the decision, the ALJ reasoned that some of plaintiff's difficulties stemmed from his poor sleep habits, such as staying up all night reading or watching television and sleeping during the day (AR 22, 716), and identified a volitional element in his lack of self-care, pointing to his appearance at DVR with inappropriate dress and disheveled hair, a debate as to whether this was indicative of drug use, and his rejection of his counselor's advice to get a haircut (AR 23).

The ALJ also considered the evidence of plaintiff's substance use, including significant inconsistencies in his reporting regarding his use of marijuana and cocaine.  (AR 29.)  Plaintiff continued his chronic use of marijuana despite advice from his providers that he quit due to associated medical symptoms, and evidence the use was counter-indicated by his asthmatic condition.  (AR 597, 704, 719, 1130, 1211, 1214.)  Plaintiff's therapist had instructed him not to use marijuana prior to their sessions (AR 565), and plaintiff acknowledged his use "would limit his employment opportunities and opined that his 'slight memory problems' and difficulty concentrating could be attributable to his use of marijuana."  (AR 29 (citing AR 565, 576, 716, 1062).)  His occasional cocaine use was counter-indicated by his antidepressant.  (AR 943.)

Despite all of these issues, plaintiff continued using throughout most of the relevant period.

REPORT AND RECOMMENDATION
PAGE - 23

1   (AR 29.) He reported his intent to switch medication managers because the manager required him

2   to stop using marijuana. Dr. Simpson found plaintiff's symptoms to predate marijuana use, but

3   "included a 'rule out' diagnosis of marijuana induced depressive/anxiety disorder and later opined

4   it might be exacerbating his [symptoms] and [was] definitely not improving his anxiety." (*Id*.

5   (citing AR 772, 789-90).)   Dr. Simpson ultimately deemed sobriety a critical step in improving

6   plaintiff's anxiety and mood symptoms. (AR 777; *see also* AR 780 (smoking marijuana "makes

7   it easier for him to avoid, eg, completing and sending" out a resume).)   After a brief period of

8   abstinence, another provider found plaintiff the "[m]ost functional" the provider had ever seen

9   him. (AR 599.) However, by January 2013, plaintiff "was using the substance daily against his

10  psychiatrist's advice, not adhering to his medication schedule, and missing counseling

11  appointments." (AR 30 (citing AR 788).) In subsequently transferring plaintiff's care to Dr. Shim,

12  Dr. Simpson observed plaintiff "appears less anxious, less agitated and labile, and more insightful

13  when he is using less marijuana." (AR 618.)

14        The ALJ also considered other evidence in the record associated with plaintiff's marijuana

15  use. For example, she construed his involvement in an initial intake for an addiction program in

16  the Spring of 2012 as an attempt to obtain State benefits, statements made during an August 2013

17  assessment to reflect "a method to avoid chemical dependency treatment through the State[,]" and

18  evidence associated with an August 2012 medical marijuana authorization "merely an ad hoc

19  attempt to justify his use." (AR 29-30 (citations to record omitted).)

20        Only after engaging in the above-described analysis did the ALJ address "avoidance." In

21  so doing, the ALJ included medical evidence associated with plaintiff's avoidant behavior,

22  evidence clearly associated with his mental impairments. The ALJ also speculated as to an element

23  of dependency, and pointed to evidence of a time when plaintiff was able to actuate. Plaintiff does

1    not demonstrate error in this particular part of the decision and, as the Commissioner observes,

2    does not otherwise challenge the ALJ's assessment of his symptom testimony.  The Court finds

3    no error established in the paragraph discussing avoidance.

Impact of Errors on RFC

4

5    Plaintiff argues the ALJ's errors in consideration of the medical and other evidence

6    impacted the RFC.  An RFC assessment need not account for limitations or impairments the ALJ

7    properly rejected.  *See Bayliss*, 427 F.3d at 1217-18.  Here, because the ALJ did err in his

8    consideration of two physicians' opinions, the RFC could have been implicated.

Remand

9

10    The Court has discretion to remand for further proceedings or to award benefits.  *See*

11    *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990).  However, a remand for an immediate award

12    of benefits is an "extreme remedy," appropriate "only in 'rare circumstances.'"  *Brown-Hunter v.*

13    *Colvin*, 806 F.3d 487, 495 (9th Cir. 2015) (quoting *Treichler v. Comm'r of Soc. Sec. Admin.*, 775

14    F.3d 1090, 1099 (9th Cir. 2014)).  *Accord Leon v. Berryhill*, No. 15-15277, 2017 U.S. App. LEXIS

15    22330 at *3, 847 F.3d 1140, ___ (9th Cir. Nov. 7, 2017) ("An automatic award of benefits in a

16    disability benefits case is a rare and prophylactic exception to the well-established ordinary remand

17    rule.")

18    Before remanding a case for an award of benefits, three requirements must be met.  First,

19    the ALJ must have "'failed to provide legally sufficient reasons for rejecting evidence, whether

20    claimant testimony or medical opinion.'"  *Brown-Hunter*, 806 F.3d at 495 (quoting *Garrison v.*

21    *Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014)).  Second, the Court must conclude "'the record has

22    been fully developed and further administrative proceedings would serve no useful purpose.'"  *Id.*

23    In so doing, the Court considers the existence of "'outstanding issues'" that must be resolved

REPORT AND RECOMMENDATION
PAGE - 25

before a disability determination can be made. *Id.* (quoting *Treichler*, 775 F.3d at 1105). Third, the Court must conclude that, "'if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.'" *Id.* (quoting *Garrison*, 759 F.3d at 1021).[4] *See also Treichler*, 775 F.3d at 1101, 1105 (the Court considers the existence of outstanding issues *before* considering whether to credit a claimant's testimony or a medical opinion as a matter of law; "Third, if we conclude that no outstanding issues remain and further proceedings would not be useful, we . . . [find] the relevant testimony credible as a matter of law, and then determine whether the record, taken as a whole, leaves "'not the slightest uncertainty as to the outcome of [the] proceeding[.]'") (citations omitted); *accord Leon*, 2017 U.S. App. LEXIS 22330 at *6.

Finally, even with satisfaction of the three requirements, the Court retains "'flexibility'" in determining the proper remedy. *Brown-Hunter*, 806 F.3d at 495 (quoting *Garrison*, 759 F.3d at 1021). The Court may remand for further proceedings "'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'" *Id.* As stated by the Ninth Circuit:

> The touchstone for an award of benefits is the existence of a disability, not the agency's legal error. To condition an award of benefits only on the existence of legal error by the ALJ would in many cases make "disability benefits . . . available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."

*Id.* at 495 (quoted sources omitted). *Accord Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F.3d

---

[4] Although not applicable to the ALJ's December 2015 decision, the SSA revised its regulations regarding the consideration of medical opinions with the intent "to make it clear that it is never appropriate under our rules to 'credit-as-true' any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 at 5858-60 (January 18, 2017) (regulation changes effective March 27, 2017). The SSA further clarified that the "credit-as-true rule" is "inconsistent with the general rule that, when a court finds an error in an administrative agency's decision, the proper course of action in all but rare instances is to remand the case to the agency for further proceedings." *Id.*

REPORT AND RECOMMENDATION
PAGE - 26

1135, 1138 (9th Cir. 2011) ("A claimant is not entitled to benefits under the statute unless the

claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be.")  If the record is

"uncertain and ambiguous," the matter is properly remanded for further proceedings. *Treichler*,

775 F.3d at 1105.

Plaintiff argues the evidence of his difficulty leaving the home should be credited and

benefits awarded given the VE's testimony a single absence a month would preclude employment.

Responding to an argument of the Commissioner, plaintiff denies the need for a remand so that

the ALJ can consider whether or not his use of substances is material. *See* 42 U.S.C. § 423(d)(2)(C)

(a claimant is not entitled to disability benefits "if alcoholism or drug addiction would . . . be a

contributing factor material to the Commissioner's determination that the individual is disabled."),

and 20 C.F.R. §§ 404.1535, 416.935 (where relevant, an ALJ must conduct a drug abuse and

alcoholism (DAA) analysis and determine whether a claimant's disabling limitations remain

absent the use of drugs or alcohol).  Specifically, plaintiff argues that, because the ALJ failed to

conduct the proper analysis in the first instance, the Court may not affirm the Commissioner's

argument any disability is caused by cannabis abuse. *See Bustamante v. Massanari*, 262 F.3d 949,

955 (9th Cir. 2001) (ALJ must, first, identify disability under five step procedure and, second,

conduct a DAA analysis to determine whether substance abuse was material to disability), and

*Parra v. Astrue*, 481 F.3d 742, 747-48 (9th Cir. 2007) ("If the remaining limitations would still be

disabling, then the claimant's [DAA] is not a contributing factor material to his disability. If the

remaining limitations would not be disabling, then the claimant's substance abuse is material and

benefits must be denied.").

Further administrative proceedings in this case would serve the useful purpose of allowing

the ALJ to reconsider and address the medical opinions of Drs. Simpson and Parker and, if

implicated, plaintiff's symptom testimony, RFC, and the ALJ's conclusions at steps four and five. A remand would also allow for consideration of any further information pertinent to plaintiff's sleep apnea, hypersomnia/severe daytime somnolence, his use of a CPAP machine or any other relevant treatment, and any further investigation into his alleged narcolepsy. *See, e.g., Leon*, 2017 U.S. App. LEXIS 22330 at *11-12 (finding remand "useful here because 'the presentation of further evidence . . . may well prove enlightening in light of the passage of time,' regarding whether Leon's symptoms are or would be significantly reduced with proper use of the CPAP machine.") (quoting *Treichler*, 775 F.3d at 1101 (internal quotation marks omitted)).

This case does not present the rare circumstance warranting an award of benefits. Instead, evidence in the record raises issues pertinent to the question of whether plaintiff is properly deemed disabled and entitled to benefits. Those issues include, but are not limited to the relevance of plaintiff's use of substances throughout much of the relevant time period. The ALJ should, as such, also conduct a DAA analysis on remand.

## CONCLUSION

For the reasons set forth above, this matter should be REMANDED for further administrative proceedings.

## DEADLINE FOR OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be

ready for consideration by the District Judge on **May 4, 2018**.

        DATED this <u>17th</u> day of April, 2018.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 29